Norman M. LITTELL, Appellant,

v.

Raymond NAKAI, Appellee.

No. 19296.

United States Court of Appeals Ninth Circuit.

April 16, 1965.

Rehearing Denied June 1, 1965.

Frederick Bernays Wiener, John F. Doyle, Washington, D. C., William H. Rehnquist, Phoenix, Ariz., for appellant.

Harold E. Mott, E. Tillman Stirling, Welch, Mott & Morgan, Washington, D. C., for appellee.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, Atty. Dept. of Justice, Washington, D. C., Charles A. Muecke, U. S. Atty., Phoenix, Ariz., amici curiæ, U. S. A.

Before JERTBERG, KOELSCH and DUNIWAY, Circuit Judges.

KOELSCH, Circuit Judge.

This appeal involves a question of the jurisdiction of the United States District Court over a suit brought by a non Indian against a member of the Navajo Tribe of Indians.

Norman M. Littell, the plaintiff-appellant, is the General Counsel and Claims Attorney of the Navajo Tribe; he has held that position for over 16 years, and his present retainer, evidenced by a written contract duly approved by the Secretary of the Interior and Commissioner of Indian Affairs, as required by 25 U.S.C. § 81, does not expire until August 7, 1967. He is a resident of Maryland.

Raymond Nakai, the defendant-appellee, is the Chairman of the Navajo Tribal Council. He was elected to that position by popular vote in March, 1963. He is a resident of Arizona.

Littell commenced this suit in the United States District Court for the District of Arizona, to secure an injunction against Nakai. The gravamen of his complaint was Nakai's alleged tortious interference with Littell's performance of the contract. He alleged that Nakai sought to have him removed as General Counsel by the Secretary of the Interior;[1] that Nakai has prevented him from appearing before the Tribal Council when in session and, at successive meetings, has caused him to be forcibly ejected from the Council Chamber; and that Nakai has prohibited the Tribe from paying to him accrued retainer fees amounting to more than $10,000 at the time the complaint was filed. He further charged that in these matters Nakai acted arbitrarily, wholly without justification and in excess of his authority as chairman.

The district court granted Littell a restraining order but, following a hearing, held that jurisdiction was lacking and dismissed the complaint. Littell has appealed.

We conclude that the decision of the lower court was right, and the judgment should be affirmed.

The matter in controversy is not, as Littell urges, one "arising under the Constitution laws or treaties of the United States," within the meaning of 28 U.S.C.A. § 1331. "A case in law or equity" said Chief Justice Marshall in the early case of Cohens v. Virginia, 6 Wheat. 264, 378, 19 U.S. 264, 378, 5 L.Ed. 257 (1821) "* * * may truly be said to arise under the constitution or a law of the United States, whenever its correct decision depends on the construction of either." And ever since, the Court has recognized this same basic test. Thus, in Shulthis v. McDougal, 225 U.S. 561, 32 S.Ct. 704, 56 L.Ed. 1205 (1912) the Court pointed out that although the suit before it concerned conflicting claims to Creek Indian lands, allotted to individual Indians under the authority of certain statutes of the United States, jurisdiction was nevertheless lacking because the complaint did not tender any issue involving the validity or construction of those statutes. An opposite result was reached in Norton v. Larney, 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413 (1925). That suit was

---

1. The Secretary made a determined effort to discourage Littell from continuing his employment, but the latter refused to resign and instead secured from the United States District Court, for the District of Columbia, a temporary injunction directing the Secretary not to interfere with the contract or seek its cancellation. On appeal, the District of Columbia Circuit Court pointed out that the Secretary lacked authority to supervise or power to terminate such contracts, and upheld the injunction. Udall v. Littell, 338 F.2d 537 (1964).

also one to quiet title to allotted Indian lands but, unlike Shulthis, its outcome directly hinged upon the meaning of the allotment statute—in particular, the mode of identifying the intended allottee. Accordingly, the court declared "[i]t thus appears that the right set up by appellees [plaintiffs] would be defeated by the construction of the act, as appellants contend, but would be supported by the opposite construction. The case, therefore, in fact is one arising under a law of the United States within the meaning of section 24, subdivision 1, of the Judicial Code." id. p. 515, 45 S.Ct. p. 147.

■■ In the case before us, plaintiff does refer in his complaint to 25 U.S.C § 81; plainly, the purpose is to show that the retainer contract, having been approved by the proper officials as required by federal law, vested plaintiff with legally recognized rights entitled to judicial protection. Green v. Menominee Tribe of Indians, 233 U.S. 558, 34 S.Ct. 706, 58 L.Ed. 1093 (1914). But "[a] suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of such a law upon the determination of which the result depends." Schulthis v. McDougal, supra, at page 569, 32 S.Ct. at page 706. From the pleading it is apparent that the "real substance of the controversy" [Gully v. First Nat'l Bank, 299 U.S. 109, 114, 57 S.Ct. 96, 8 L.Ed. 70 (1936)] centers upon the contract and its construction rather than the statutory basis for the contract, and as said in Puerto Rico v. Russell & Co., 288 U.S. 476, 483, 53 S.Ct. 447, 451, 77 L.Ed. 903 (1933) "The federal nature of the right to be established is decisive—not the source of the authority to establish it."

We agree with Littell that his complaint sufficiently discloses all facts required by 28 U.S.C. § 1332 to invoke the diversity jurisdiction of the district court; but we think that the allegations appearing in the complaint, together with the affidavits and other materials presented to the court at the hearing, show that this controversy is of the type within the exclusive jurisdiction of the Navajo Tribal Court.

Historically, the Indian Tribes were regarded as distinct political communities [Worcester v. Georgia, 31 U.S. 515 at 560, 6 Pet. 515, 8 L.Ed. 483 (1832); Ex parte Crow Dog, 109 U.S. 556 at 568, 3 S.Ct. 396, 27 L.Ed. 1030 (1883)]. Thus, in United States v. Kagama, 118 U.S. 375 at 381–382, 6 S.Ct. 1109, 1112–1113, 30 L.Ed. 228 (1886) the Court, after noting the "anomalous" and "complex character" of the relationship between the general government and the Indian Tribes, declared that the Tribes " * * * were and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as states, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the state within whose limits they resided."

Present day recognition of the autonomous status of the Navajo Indian Tribe over "internal and social relations" is provided by Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). That case, it is true, dealt with a question of the power of the State of Arizona over the Navajo Indian Reservation; nevertheless, the Supreme Court, in reaching its decision that Arizona State courts had no authority to entertain a civil suit by an outsider against an Indian arising out of a transaction on the Reservation, emphasized that the general government, at the inception of its dealings with the Navajos, regarded the Navajo Tribe as a separate political community. The Court said, with reference to the Navajo Treaty of 1868 (15 Stats. 667):

"Implicit in these treaty terms, as it was in the treaties with the Cherokees involved in Worcester v. State of Georgia, was the understanding

that the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed." (358 U.S. at 221–222, 79 S.Ct. at 271).

The Court also pointed out that Congress had done nothing tending to show a change of this view; that although Congress unquestionably possesses the power to do so, it has not limited or withdrawn from the Navajo Tribe its right to regulate the handling of and exercise control in disputes over property and property rights. To the contrary, the Court declared that "Since then, Congress and the Bureau of Indian Affairs have assisted in strengthening the Navajo tribal governments and its courts. * * * The Tribe itself has in recent years greatly improved its legal system through increased expenditures and better-trained personnel." Surely, this assistance which has been so productive manifests a Congressional reaffirmation of the basic policy iterated in Worcester v. Georgia, and uniformly reiterated in cases ever since. And we believe that the rationale in the Williams case applies here. The intrusion of the State, it was said, "would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." As the Supreme Court recently characterized its holding in Williams, "[W]e declared that the test of whether a state law could be applied on Indian reservations * * * was whether the application of that law would interfere with reservation self-government." Organized Village of Kake v. Egan, 369 U.S. 60, at 67, 68, 82 S.Ct. 562, at 567, 7 L.Ed.2d 573 (1962). In sum, then, a strong Congressional policy to vest the Navajo Tribal Government with responsibility for their own affairs emerges from the decision in Williams. Plainly, fruition of the policy depends upon freedom from outside interference. And federal court jurisdiction would be equally disruptive of the policy as would state court jurisdiction.

We have seen, however, that the exclusive tribal jurisdiction may be altered by express declaration of Congress. Littell urges that the diversity statute is just such a declaration.

Ever since Erie v. Tompkins, however, it has been settled that a federal court sitting in a diversity case operates as an adjunct to the state court. The reason is clear.

"[W]here * * * one is barred from recovery in the state court, he should likewise be barred in the federal court. The contrary result would create discriminations against citizens of the State in favor of those authorized to invoke the diversity jurisdiction of the federal courts. It was that element of discrimination that Erie R. Co. v. Tompkins was designed to eliminate."

Woods v. Interstate Realty Co., 337 U.S. 535, 538, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949).

Here, it is apparent that if Littell were a citizen of Arizona, he would be precluded from suit in the Arizona courts under the doctrine of Williams v. Lee. And consistent with the fundamental principle of diversity jurisdiction we have just voiced, no reason appears why the result should be otherwise because Littell instituted his suit in a federal court. In short, even after granting that Littell's suit falls within the letter of the diversity statute, we believe that the basic principle of diversity jurisdiction requires reference of the suit to the Navajo Tribal Courts.

Littell vigorously contends that the principle of Williams v. Lee is inapplicable to this case. His rationale is ingenious. His argument is premised on the assumption that Nakai acted beyond the scope of his authority as Chairman of the Navajo Tribe. This fact, he declares, must be deemed true because the allegation contained in his complaint was not challenged or denied. He then points out, relying on the doctrine announced in Arkansas v. State of Texas, 346 U.S. 368, 74 S.Ct. 109, 98 L.Ed. 80 (1953) that one party to a contract may commence and

prosecute an action for tortious interference with the contract against an officious intermeddler without the joinder of the other contracting party. From this, he concludes that the "internal affairs" of the tribe are not involved. Or, as he more positively states the proposition, "Since, therefore, the present action was not one brought against the Navajo Tribe of Indians and since that Tribe was not even a necessary party to the proceeding, this case cannot possibly involve the internal affairs of the Navajo Tribe of Indians."

This conclusion is a patent *non sequitur*. The Navajo Tribe as such need not have a proprietary or other legally recognized interest in the particular litigation or its outcome in order for the controversy to be one concerning internal affairs. To so conclude mistakes the nature of the Tribe's interest and ignores the holding in Williams v. Lee. In that case a non Indian licensed to trade on the Navajo Reservation sued a tribal member to recover for goods sold—strictly a "private" mercantile transaction between individuals. Yet the Supreme Court concluded that the matter was one involving the Tribe's internal affairs. No doubt the Tribe in Williams, as in the case before us, was neither an indispensable, a necessary, or even a proper party to the action, but that was not the test. Rather, the test was a broader one hinging on whether the matter was one demanding the exercise of the Tribe's responsibility for self government. Here, we believe that requisite is met. Indeed the very heart of the dispute appears to center on Nakai's authority as Chairman.

It is true that Williams involved a transaction entirely within the geographical limits of the Reservation, while here some of the alleged acts took place elsewhere. But it is also true that the basis of this suit is of more intimate concern to the Tribe as a whole than the suit in Williams. We do not read Williams as holding the locus of some particular act as conclusive.

Judgment affirmed.