**Mary POITRA, as mother and surviving parent of Richard A. Primeaux, Appellant,**

v.

**Donald DEMARRIAS, Appellee.**

**No. 74-1025.**

United States Court of Appeals, Eighth Circuit.

Submitted April 19, 1974.

Decided Aug. 28, 1974.

---

53. Findings of Fact 61, 62 and 63.

54. Conclusion of Law 11.

STEPHENSON, Circuit Judge.

In this wrongful death action brought by one Indian against another Indian, the primary issue raised on appeal is whether diversity jurisdiction in the federal district court pursuant to 28 U.S.C. § 1332(a) (1970) is precluded by reason of the absence of subject-matter jurisdiction in the courts of the State of North Dakota over civil causes of action arising in Indian country. Gourneau v. Smith, 207 N.W.2d 256 (N.D.1973).[1]

Plaintiff-appellant and defendant-appellee are both enrolled Indians residing within the exterior boundaries of the Standing Rock Sioux Indian Reservation. Appellant, a citizen of North Dakota, brought this action against appellee, a citizen of South Dakota, pursuant to the provisions of Chapter 32–21 of the North Dakota Century Code for the wrongful death of her minor son. Appellant's son, Richard A. Primeaux, died from injuries sustained in an automobile accident which occurred on the Standing Rock Reservation, near Selfridge, North Dakota. The automobile in which Primeaux was a passenger was struck from the rear by an automobile driven by appellee.

Appellant filed her complaint on June 15, 1972. Service was made upon the defendant by serving the North Dakota State Highway Commissioner on June 16, 1972, pursuant to the provisions of the North Dakota non-resident motorist statute, N.D.C.C. § 39–01–11. No responsive pleading was filed, and on August 22, 1973, appellant filed a notice of application for default judgment which was served on the North Dakota Unsatisfied Judgment Fund pursuant to N.D.C.C. § 39–17–03 (1972). On September 11, 1973, a Special Assistant Attorney General for North Dakota, representing the Fund,[2] moved on behalf of appellee

Marvin J. Sonosky, Washington, D. C., for appellant.

John M. Olson, Sp. Asst. Atty. Gen., Bismarck, N. D., for appellee.

Before HEANEY and STEPHENSON, Circuit Judges, and TALBOT SMITH, Senior District Judge.[*]

---

[*] TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

[1] See 25 U.S.C. § 1322(a) (1970); North Dakota Century Code § 27–19–01 et seq. (1974).

[2] N.D.C.C. § 39–17–04 (1972) reads:

* * * the attorney general may enter an appearance, file a defense, appear by counsel at the trial or take such other action as he may deem appropriate on behalf and in the name of the defendant, and

to dismiss the action for lack of subject-matter jurisdiction.

On October 27, 1973, the district court dismissed the action. Poitra v. Demarrias, 369 F.Supp. 257 (D.N.D.1973). In its memorandum and order it stated that in a diversity action it could not "entertain any action not maintainable in a North Dakota Court." Id. at 258 citing Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The district court further stated that:

In Guaranty Trust Co. of N.Y. v. York, 326 U.S. 99, 108–109, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079, the Supreme Court said:

"* * * But since a federal court adjudicating a state-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another Court of the State, it cannot afford recovery if the right to recover is made unavailable by the State * * *."

In this case, a Federal Court, by reason of diversity of citizenship and amount in controversy, is asked to adjudicate a right created by the State. The plaintiff's exercise of that right is subject to the laws of North Dakota as interpreted by the Courts of North Dakota.

By its decision in Gourneau v. Smith, 207 N.W.2d 256, the North Dakota Supreme Court conclusively and effectively closed the State Courthouse door to the plaintiff in this case. Id.

We reverse that determination. As noted by the Supreme Court in Hanna v. Plumer, 380 U.S. 460, 466–468, 85 S.Ct. 1136, 1141–1142 14 L.Ed.2d 8 (1965), the Erie rule is based in part upon "a realization that it would be unfair for the character or result of a litigation materially to differ because suit had been brought in a federal court" rather than in state court, and that it is "also in part a reaction to the practice of 'forum shopping' which had grown up in response to the rule of Swift v. Tyson."[3] The Court then characterized the twin aims of Erie as: "discouragement of forum-shopping and avoidance of inequitable administration of the laws." Id. at 468, 85 S.Ct. at 1142.

Clearly, Hanna established a subtle retreat from prior decisions which had led to an overconcern with conformity to state law in diversity actions. Compare Hanna v. Plumer, supra, with Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949); Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949); Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947);[4] Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

Erie, of course, teaches that federal courts in diversity actions must give deference to the "definition of state-created rights and obligations by

---

may thereupon, on behalf and in the name of the defendant, conduct his defense, and all acts done in accordance therewith shall be deemed to be acts of the defendant. * * *

3. 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842). In Hanna v. Plumer, supra at 468 n. 9, 85 S. Ct. at 1142, the Court stated:

Erie and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it

would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause plaintiff to choose the federal court.

4. One author has indicated that the Woods and Angel decisions could be explained as holding "that since the state had closed its courts to a certain type of action, the federal court out of respect for the state's policy would likewise refuse to entertain that type of case, even though it had undoubted jurisdiction." Meador, State Law and the Federal Judicial Power, 49 Va.L.Rev. 1082, 1098 (1963).

the state courts," whether substantive, procedural or quasi-procedural where the state rule of law is "bound up" with a state-created right or obligation. Byrd v. Blue Ridge Elec. Co-op., 356 U.S. 525, 535–536, 78 S.Ct. 893, 899, 2 L.Ed.2d 953 (1958). The thrust of *Erie* however, cannot be interpreted to allow in every instance the diversity jurisdiction of federal courts to be wholly controlled and dependent upon state law. As this court recently pointed out in Prashar v. Volkswagen of America, Inc., 480 F.2d 947, 952–953 (8th Cir. 1973), the primary concerns in *Erie* were with providing equal protection to citizen-defendants and with "the vital recognition of the necessary bridling of encroaching federalism in areas of *state policy*." (Emphasis added.) In addition, we noted that "federal diversity actions can never be identic to those carried out in state form," and concluded that no state policy would be violated by application of federal procedure that differed from the state rule. *Id.*

■ Similar views were expressed by the Fourth Circuit in a case in which that court grappled with the *Erie* problem. In Atkins v. Schmutz Manufacturing Co., 435 F.2d 527, 536 (4th Cir. 1970), cert. denied, 402 U.S. 932, 91 S. Ct. 1526, 28 L.Ed.2d 867 (1971), the court stated:

* * * *Erie* and its progeny may be seen as an attempt to formulate a workable doctrine governing choice of law in diversity actions which would prevent impermissible federal court interference with state rules reflecting policy considerations lying within the realm of state law-making competence. * * *

\* \* \* \* \* \*

It is, of course, neither possible nor necessary for federal courts to be totally neutral in the adjudication of state-created rights. * * * Some adoption of state court procedures by federal courts sitting in diversity may be feasible, but it may also be in conflict with the fundamental interests of the federal courts in the conduct of their own business and maintenance of the integrity of their own procedures, *the legitimate interests of a federal forum*, qua *forum*. (Emphasis added.)

The *Prashar* and *Atkins* decisions indicate that the scope of the *Erie* doctrine has been narrowed significantly since its earliest applications. It now seems clear that a federal court sitting in diversity need not mirror in every regard the state courts. The interest of the federal court in its own procedures and policies dominates in the absence of identifiable state interests which are inextricably linked with the underlying substantive right.

■ Furthermore, it is also clear that federal courts have an affirmative responsibility to guard their own jurisdiction. This point has been made primarily in the context of attempts by states to proscribe accessibility to the courts of those states to a particular class of litigants with respect to state-created substantive rights. Such efforts cannot *a priori* limit the jurisdiction of the federal courts. *See* Davis v. Ensign-Bickford Co., 139 F.2d 624, 626 (8th Cir. 1944); Stephenson v. Grand Trunk Western R. R., 110 F.2d 401 (7th Cir. 1940); State of Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391, 395–396 (S.D. Iowa 1968); Monroe v. Pape, 221 F. Supp. 635, 649 & n. 39 (N.D.Ill.1963); Martineau v. Eastern Airlines, 64 F. Supp. 235 (N.D.Ill.1946).

As explained by the Fourth Circuit in Markham v. City of Newport News, 292 F.2d 711, 713–716 (4th Cir. 1961):

In determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not to acts of states which have no power to enlarge or to contract the federal jurisdiction.

\* \* \* \* \* \*

However extensive the power of the state to deal with the substantive right, it has no power to defeat the jurisdiction of the federal courts.

\* \* \* \* \* \*

\* \* \* [A] court, in determining its own jurisdiction, must look to the constitution and laws of the sovereignty which created it. The laws of a state cannot enlarge or restrict the jurisdiction of the federal courts or those of any other state. It necessarily follows that whenever a state provides a substantive right and a remedy for its enforcement in a judicial proceeding in any state court, a judicial controversy involving the right may be adjudicated by a United States District Court if it has jurisdiction under the Constitution and laws of the United States.

This language lends strong support to the precept that federal courts have an obligation to exercise jurisdiction, when the statutory requisites are satisfied. *See* First National Bank v. United Airlines, 342 U.S. 396, 399–400, 72 S.Ct. 421, 96 L.Ed. 441 (1952). *Cf.* Schantz v. White Lightning, 502 F.2d 67 (8th Cir. filed this date).

 Against this background we turn to the problem. State assumption of civil jurisdiction over Indians is the subject matter of 25 U.S.C. § 1322(a) (1970).[5] It states, in effect, that until an Indian reservation consents to the jurisdiction of the state courts, such jurisdiction may not be assumed by the state courts of any cause of action involving Indians and arising within the boundaries of the Indian reservation. Although the state courts of North Dakota are open to Indians, the Standing Rock Reservation has not consented to jurisdiction in the manner prescribed under § 1322(a). Thus, no policy of the State of North Dakota is at issue in this case.[6] Rather, it is the Indians themselves who, by deciding not to consent to state jurisdiction, have created the federal jurisdictional problem we face in this case. As in *Prashar, supra*, and *Atkins, supra*, we can find no significant state interest that would prevent the federal court from exercising its jurisdiction in order to hear an action, such as this, founded upon a state-created substantive right. The reason that North Dakota lacks jurisdiction over this civil action is because of the special status given Indians under *federal* law, not because of any *state* policy consideration. *See* Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L. Ed.2d 251 (1959); Gourneau v. Smith, 207 N.W.2d 256 (N.D.1973).

Furthermore, we note from the legislative history of the "consent" statute that § 1322(a) was certainly not intended to deprive Indians of state-created substantive rights. On the contrary, a number of the enacted tribal codes of justice provide that the tribal court with jurisdiction of a dispute will simply apply the law of the forum in which the court sits.[7] In effect, by the enactment

---

5. The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

6. Prior to enactment of 25 U.S.C. § 1322(a) the North Dakota Supreme Court held that the state court had jurisdiction of an action arising out of circumstances almost identical to those at bar. Vermillion v. Spotted Elk, 85 N.W.2d 432 (N.D.1957).

7. *See* Canby, Civil Jurisdiction and the Indian Reservation, 1973 Utah L.Rev. 206, 217 n. 83. For example, The Code of Justice of the Standing Rock Sioux Tribe (July 1973) states at § 2.1:

Civil matters shall be governed by the laws, customs and usages of the Tribe not prohibited by the laws of the United States, applicable Federal law and applicable regulations and decisions of the De-

of § 1322(a), Congress recognized that in keeping with the semi-autonomous status of the Indian tribe relative to its relationship with state government,[8] the tribe has an interest in preventing the state from interfering with reservation affairs by unilaterally applying state law to all tribal members without tribal consent.[9] Such action would naturally infringe upon the right of the tribe to govern itself free from state interference respecting those matters arising within the boundaries of the reservation. This latter consideration was the tribal communities' major criticism of the repealed predecessor to § 1322(a), Pub.L. No. 83–280, 67 Stat. 588 (1953), see note 7, supra, which did not require consent of the tribe as a predicate to state assumption of jurisdiction.

We are mindful of the Ninth Circuit's decisions of Hot Oil Service, Inc. v. Hall, 366 F.2d 295 (9th Cir. 1966), and Littell v. Nakai, 344 F.2d 486 (9th Cir. 1965), both of which held that the federal district court could not assume diversity jurisdiction in disputes arising on the Navajo Indian Reservation unless the state courts also had subject-matter jurisdiction, citing Woods v. Interstate Realty Co., supra, 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949). Both of these cases can be distinguished. They were based on the concept of non-interference with tribal affairs that developed out of the Supreme Court's opinion in Williams v. Lee, 358 U.S. 217, 79 S. Ct. 269, 3 L.Ed.2d 251 (1959). However, in neither case was the court faced with the application of a state-created right under which an individual Indian sought to recover from another Indian. In Hot Oil, the claim involved a lease agreement concerning facilities built on tribal land and subleased by a member of the tribe to a non-Indian. 366 F.2d at 296–297. In Littell, the plaintiff's complaint was based on a charge that the tribal chairman had tortiously interfered with the performance of a contract

partment of the Interior. The laws of the state where the reservation is located may be employed as a guide * * *. Where appropriate, the laws of the state where the reservation is located may be employed to determine civil matters.

8. See discussion in McClanahan v. State Tax Commission, 411 U.S. 164, 168–173, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

9. See Canby, 1973 Utah L.Rev., supra at 219. See 113 Cong.Rec. 35,474 (1967) (remarks of Senator Ervin):

Title III repeals December 7 Public Law 83–280, which permits States to assume criminal and civil jurisdiction over Indian tribes regardless of the wishes of the tribe.

In 1953, Public Law 83–280 (67 Stat. 588) conferred to certain States civil and criminal jurisdiction over Indian country. Tribes have been critical of Public Law 83–280 because it authorizes the unilateral application of State law to all tribes without their consent and regardless of their needs or special circumstances. Moreover, it appears that tribal laws were unnecessarily preempted and, as a consequence, tribal communities could not be governed effectively.

The Subcommittee on Constitutional Rights in its "Summary Report of Hearings and Investigations of the Constitutional Rights of the American Indian" arrived at the following conclusion concerning legislation to remedy Public Law 83–280:

Indian governments do not, of course, bear full responsibility for those denials of rights which have occurred or which in the future may occur. It appears, paradoxically, that the States have also erred, both by failing to prosecute offenses and by assuming civil and criminal jurisdiction when that assumption was clearly against the wishes of the Indian peoples affected. Concurrent jurisdiction by the United States in the first instance and a repeal of Public Law 280 or at least its modification to include tribal consent as a precondition of the State's assumption of jurisdiction, would seem to provide a suitable remedy.

Under this title, any State desiring to assume civil and criminal jurisdiction over an Indian tribe must obtain the consent of the affected tribe. The repeal of Public Law 280 has been a major goal of all Indian tribes since the enactment of this hasty legislation—legislation which prevented Indians from having any voice in how or by whom they were to be governed.

See also S. Ervin, Protecting the Rights of the American Indian, S.Rep.No.841, 90th Cong., 1st Sess. (1967).

that the non-Indian plaintiff had made with the tribe. 344 F.2d at 487. In both instances, the non-interference and tribal self-government policies from *Williams* are obviously in issue, and the refusal by the courts to accept jurisdiction seems correct under those facts.

■ In the instant case, however, the facts are very different. Here, one Indian seeks to avail herself of the federal court in an action against another Indian. This fact in itself would seem to negate any interference claim that could be made since no interfering outsiders are trying to foist jurisdiction on the Indians. In addition, the underlying cause of action here is based on a *state-created* wrongful death statute and judgment fund, not a dispute that involves considerations of policy regarding tribal lands or customs. Since we can discern no possible interference with tribal or reservation self-government here, there is no reason why *Hot Oil* or *Littell* should control this case.[10]

■ Where, as in the case before us, the statutory basis for federal jurisdiction exists[11] and the substantive right being asserted has been created by the state,[12] a federal statute precluding state court jurisdiction in civil matters unless tribal consent is given does not close the federal courthouse doors to these litigants. In *Littell*, the court indicates that "federal court jurisdiction would be equally disruptive of the policy [of tribal self-government] as would state court jurisdiction." We disagree and emphasize that the purpose of repealing Pub.L. No. 83–280, *supra*, and enacting § 1322(a) was to prevent unwanted and unnecessary encroachment upon Indian tribes *by the states*.[13] We fail to conceive of any Congressional or judicial policy limitations requiring the federal court to refuse adjudication of this or similar claims when its jurisdiction is properly invoked. *Cf.* Markham v. City of Newport News, *supra*, 292 F.2d 711 (4th Cir. 1961). We would do a disservice to Indian citizens and to the legislators who passed the Indian Bill of Rights if we construed that right-granting legislation as giving Indians *less* than a full measure of federal rights and remedial avenues.

In the final analysis, we hold that in the context of this case the federal district court is vested with subject-matter jurisdiction under 28 U.S.C. § 1332(a) (1970). The order of dismissal of the district court is reversed.

10. Inasmuch as the Standing Rock Sioux Tribe has indicated in its tribal code that a state license and registration are necessary prerequisites for driving on the reservation, The Code of Justice of the Standing Rock Sioux Tribe §§ 8.1, 8.3 (July 1973), a persuasive argument can be made that the tribe has waived any "interference" claims with regard to suits in which the Unsatisfied Judgment Fund is involved. This is supported by the fact that each driver in North Dakota contributes, through his or her annual car registration fee, one dollar to the fund. North Dakota Century Code § 39–17–01 (1972). Furthermore, by acquiescing to the state regulations in this manner, the tribe may have left such fund cases to the "residuary" jurisdiction of the state. *See* State ex rel. Iron Bear v. District Court, 512 P.2d 1292, 1298 (Mont.1973).

11. 28 U.S.C. § 1332(a) (1970). Both the $10,000 jurisdictional amount and diversity of citizenship are present.

12. Chapter 32–21 of the North Dakota Century Code, *supra*.

13. *See* legislative history, note 9, *supra*. *See also* McClanahan v. State Tax Commission, *supra*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed. 2d 129 (1973).