The SUPERIOR OIL COMPANY, a Nevada corporation, Plaintiff,

v.

Joseph MERRITT, and Evelyn Merritt, his wife; Jasper Merritt and Mrs. Jasper Merritt, his wife; Harrison Merritt and Annie Merritt, his wife; Gilbert Merritt; Anna Merritt; Marie Merritt; Marli Bellson; Rosina Merritt; Susie Myerson; First Doe; Second Doe; Third Doe; Fourth Doe; Fifth Doe; Sixth Doe; Seventh Doe; Eighth Doe; Ninth Doe; Tenth Doe; Defendants.

C 84–0447J.

United States District Court, D. Utah, C. Division.

Sept. 16, 1985.

Arthur H. Nielsen, Clark Nielsen and Thomas C. Jepperson, Nielsen & Senior, Salt Lake City, Utah, for plaintiff.

Steven C. Boos, D.N.A. Peoples Legal Services, Inc., Mexican Hat, Utah, for defendants.

## MEMORANDUM OPINION

JENKINS, Chief Judge.

The court heard oral arguments on the defendants' motion to dismiss the plaintiff's amended complaint for lack of subject matter jurisdiction on January 29, 1985. Arthur H. Nielsen and Thomas Jepperson appeared for the plaintiff, and Steven Boos appeared for the defendants. Following oral arguments, the court took the matter under advisement. Having considered the arguments on both sides, the court now enters this memorandum opinion.

### I. Background

On May 15, 1984, the plaintiff, Superior Oil Company, filed a complaint with this court seeking damages and injunctive relief. It alleged that it was the operator of certain oil and gas leases issued by the Navajo Tribe on land in San Juan County, Utah, and that the defendants had purposefully interfered with its operations under the leases. The defendants had allegedly fired a shotgun at Superior employees, prevented them from cleaning up an oil spill near one of the wells and prevented them from repairing a leak in a flow line by blocking their access to the line and threatening to harm both the employees and equipment. Superior asked for damages resulting from its involuntary shutdown of the wells and for an injunction preventing the defendants from interfering with its operations and right to possess the well sites under the leases. Superior alleged diversity as the sole basis for jurisdiction.

The defendants moved to dismiss the complaint on the grounds that the court lacked subject matter jurisdiction over the action. They reasoned that, because the dispute arose on a reservation and a tribal forum was available to the plaintiff, it would infringe on tribal sovereignty for this court to take jurisdiction of the case by undermining the authority of tribal courts.

Superior responded by amending its complaint to allege as an alternative basis for jurisdiction 28 U.S.C. § 1331 (so-called federal question jurisdiction). Specifically, Superior alleged that its claim arose under the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396d (1982); 25 C.F.R. §§ 211.19–.21 (operating regulations for tribal leases); 43 C.F.R. subpt. 3162 (requirements for lessees and operators of Indian oil and gas leases); and article I of the 1868 treaty between the United States and the Navajo Tribe, 15 Stat. 667. But Superior's factual allegations remained essentially the same. The only additional

allegations were that Superior carried on its operations pursuant to the cited federal regulations and that the defendants' conduct violated the cited federal laws. The defendants moved to dismiss this amended complaint for lack of subject matter jurisdiction as well.

"Although the federal government has long had a special relation to the American Indian, there is no jurisdiction in the federal courts to hear a case merely because an Indian ... is a party to it. A statutory grant of jurisdiction must be found." C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3579 at 255 (2d ed. 1984). The only statutory grounds for jurisdiction that Superior has asserted are 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1332 (diversity jurisdiction). After considering the parties' arguments, the court concludes that neither section gives it subject matter jurisdiction over this dispute. Consequently, the plaintiff's complaint must be dismissed.

## II. Federal Question Jurisdiction

■ A federal district court has original jurisdiction in "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1982). An action does not "arise under" federal law "merely because it may have its origin or source in federal law. The asserted right must depend upon the operative effect of federal law, i.e., the result of the suit must depend upon the construction and effect of such law." *Midwestern Devs., Inc. v. City of Tulsa*, 333 F.2d 1009, 1011 (10th Cir.1964), *cert. denied*, 379 U.S. 989, 85 S.Ct. 702, 13 L.Ed.2d 610 (1965). In other words, the plaintiff's claim must "necessarily [draw] into question the interpretation or application of federal law." *New York v. White*, 528 F.2d 336, 338 (2d Cir.1975).

■ Superior asserts three possible bases for federal question jurisdiction. First, it asserts that, because oil and gas leases of Indian lands are governed by federal law, *see, e.g., Bledsoe v. United States*, 349 F.2d 605, 607 (10th Cir.1965), its right to

possess its leasehold interests, which it seeks to protect in this action, raises a federal question, citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (*Oneida I*).

Superior's reliance on *Oneida I* is misplaced. *Oneida I* involved an Indian tribe's claim for wrongful possession. The Oneidas' asserted right to possession was based in part on "their aboriginal right of occupancy which was not terminable except by act of the United States" and was guaranteed by treaties with the United States. 414 U.S. at 677–78, 94 S.Ct. at 782–83. The Court held that the tribe's complaint raised a federal question.

Superior is not an Indian tribe and is not seeking to enforce "aboriginal" land rights. Rather, Superior's right of possession is based on its lease agreements with the Navajos and is protected by local—not federal—law. "Where tribal possessory rights are not involved, the courts have refused to extend the rationale of *Oneida* to hold that a federal question is present." *Begay v. Kerr-McGee Corp.*, 499 F.Supp. 1317, 1322 (D.Ariz.1980), *aff'd*, 682 F.2d 1311 (9th Cir.1982). *Oneida I* is therefore inapplicable to Superior's claim.

■ Superior has tried to bring its claim within *Oneida I* by calling it a "suit for possession." In doing so, however, it has mischaracterized its claim. Despite the label, Superior's claim remains essentially a garden-variety tort action—a suit for intentional interference with a contractual relation. To bring a case within federal question jurisdiction, "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." *Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936). The right Superior seeks to establish is the right to be free from unreasonable interference with its rights and duties under its leases and unit agreements with the Navajo tribe. Superior can establish a prima facie case by showing that the defendant intentionally

interfered with its existing contractual relationship under those agreements. *See* W. Prosser, *Handbook of the Law of Torts* 942 (4th ed. 1971). The fact that authority for the Navajos to enter the agreements is ultimately derived from federal law does not turn Superior's claim into a federal question. *See Puerto Rico v. Russell & Co.*, 288 U.S. 476, 483, 53 S.Ct. 447, 449, 77 L.Ed. 903 (1933) ("The federal nature of the right to be established is decisive—not the source of the authority to establish it").

◼ In short, plaintiff's complaint does not involve the validity or construction of federal law. Neither are the validity and construction of the leases in issue. The lessor—the Navajo tribe—is not even a party to this action. The defendants may wish to challenge the validity of the leases as part of their defense, but merely because a complaint anticipates or replies to a probable defense that would be based on federal law does not mean it arises under federal law within the meaning of section 1331. *Begay v. Kerr-McGee Corp.*, 682 F.2d 1311, 1314 (9th Cir.1982). The court concludes that the mere fact that Superior's leases are governed by federal law does not mean that Superior's claim arises under federal law.

◼ Second, Superior asserts that it has stated a cause of action under the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396d (1982), citing *Rainbow Resources, Inc. v. Calf Looking*, 521 F.Supp. 682 (D.Mont.1981), as authority for its assertion. The plaintiff in that case, a non-Indian oil company, was the lessee under oil and gas leases with certain Blackfoot allottees of Indian trust land. It had completed a dry well and sought to remove its equipment from the leased premises. The lessor obtained an order from the tribal court restraining the oil company from removing any equipment, despite the fact that the company had applied for and subsequently received authorization to remove the equipment under 30 C.F.R. § 221.34. The district court found that it had federal question jurisdiction to issue an injunction restraining enforcement of the tribal

court's order. It found such authority implicit in the Indian Mineral Leasing Act, which provides that all "operations under any oil, gas or other mineral lease issued pursuant to the terms of any act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior." 25 U.S.C. § 396d.

The present case is easily distinguished. Although the plaintiff in both cases is a non-Indian lessee seeking injunctive relief, the plaintiff in *Rainbow Resources* was seeking to enjoin a tribal court that had issued an order arguably in conflict with federal regulations validly promulgated under authority of federal law. Superior, on the other hand, is not trying to establish its rights under federal law. It is only trying to protect its rights under its leases, by enjoining the defendants—who have nothing to do with the leases—from further tortious conduct. Congress may have intended for lessees of lands covered by the Indian Mineral Leasing Act to have a federal cause of action for injunctive relief when the official actions of a tribal court conflicted with federal regulations promulgated under that act, as the court in *Rainbow Resources* found. But there is no indication that Congress intended for lessees to have a similar cause of action where the plaintiff is not seeking to establish his rights under the lease but is merely seeking to prevent a stranger to the lease from interfering with those rights. This court concludes that Congress did not intend to create such a remedy in the Indian Mineral Leasing Act. Such a remedy was already available to lessees under local law.

◼ The final basis for federal question jurisdiction that Superior has asserted is article I of the Navajo Treaty of 1868, 15 Stat. 667, which provides that Indians who have committed "a wrong or depredation" against anyone subject to the authority of the United States shall be delivered up to the United States "to be tried and punished according to its laws...."

Because persons can be "punished" only in criminal proceedings, the plain language

of the treaty confers jurisdiction on federal courts only in criminal matters. To find that the treaty gives federal courts civil jurisdiction would run counter to established rules of construction to the effect that treaties with Indian nations are to be strictly construed in favor of the Indians and against the United States. *See, e.g., McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973). *Babbitt Ford, Inc. v. Navajo Indian Tribe,* 710 F.2d 587 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984), cited by Superior, is not to the contrary. There the Ninth Circuit concluded that, far from conferring civil jurisdiction on United States courts, the treaties with the Navajos establish Navajo lands "as within the exclusive sovereignty of the Tribe under general federal supervision." 710 F.2d at 597. Although the Ninth Circuit agreed with the district court's conclusion that it had concurrent civil jurisdiction with the tribe, a finding of jurisdiction in the district court was not necessary to that decision, since the issue in *Babbitt* was whether the *tribe*— not the district court—had jurisdiction. Moreover, the basis for the district court's jurisdiction was not the 1868 treaty itself but the existence of an independent federal question, namely, the extent to which the treaty and other federal law had divested the tribe of jurisdiction over non-Indians conducting business on the reservation. *See id.* at 591. Superior is not contending that the treaty has divested the tribal court of jurisdiction in this matter. Rather, it contends that the treaty gives this court jurisdiction over the dispute. This court finds no such grant of authority in the treaty. Furthermore, this case does not depend on the construction, effect or validity of the treaty. The 1868 Navajo treaty therefore cannot be the basis for federal subject matter jurisdiction.

In short, the present action—essentially one sounding in tort—does not involve "the validity, construction or effect" of federal law. *See Schulthis v. McDougal,* 225 U.S. 561, 569, 32 S.Ct. 704, 706, 56 L.Ed. 1205 (1912). This court therefore lacks federal question jurisdiction over the matter.

### III. Diversity Jurisdiction

The question of whether or not this court has diversity jurisdiction under 28 U.S.C. § 1332(a) is more problematic. *See* F. Cohen, *Handbook of Federal Indian Law* 317 (1982 ed.) ("Application of the [diversity] statute to actions against Indians arising in Indian country is ... subject to doubt"). Section 1332(a) reads in part:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—
>
> (1) citizens of different States;
>
> (2) citizens of a State and citizens or subjects of a foreign state....

An Indian nation is not a foreign state. *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 20, 8 L.Ed. 25 (1831). Rather, at least one court has suggested that an Indian who is a citizen of the United States and resides within a state is considered a citizen of that state for purposes of diversity jurisdiction. *See Deere v. State of New York,* 22 F.2d 851, 852 (N.D.N.Y.1927), *aff'd sub nom. Deere v. St. Lawrence River Power Co.,* 32 F.2d 550 (2d Cir.1929). Here, the plaintiff is a Nevada corporation with its principal place of business in Texas. All the defendants are Indians living on the Navajo reservation in San Juan County, Utah. Since all Indians born in the United States are citizens of the United States, *see* 8 U.S.C. § 1401(b), the defendants may be considered citizens of the state of Utah. And the amount in controversy exceeds $10,000. Thus, a literal reading of section 1332(a) would seem to give this court jurisdiction over this case.

However, defendants argue that section 1332 does not apply to reservation-based disputes, and at least one court of appeals tends to agree. In two cases directly on point, the Ninth Circuit held that district courts lacked diversity jurisdiction. *Hot Oil Servs., Inc. v. Hall,* 366 F.2d 295 (9th Cir.1966); *Littell v. Nakai,* 344 F.2d 486

(9th Cir.1965), *cert. denied*, 382 U.S. 986, 86 S.Ct. 531, 15 L.Ed.2d 474 (1966). In *Littell* the general counsel for the Navajo tribe, a non-Indian, sued the chairman of the tribal council to enjoin the latter's alleged tortious interference with the plaintiff's performance of his contract with the tribe. The plaintiff asserted diversity jurisdiction. In *Hot Oil Services* a non-Indian plaintiff (a New Mexico corporation) sued an individual Indian defendant to enjoin her from interfering with its operations of a service station under a lease agreement between the parties, also alleging diversity jurisdiction. In both cases the Ninth Circuit affirmed the district court's dismissal for lack of jurisdiction.

Superior has characterized the rationale of those cases as follows: A federal court sitting in diversity "operates as an adjunct to the state court." *Littell*, 344 F.2d at 489. Because of the doctrine of *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), a non-Indian plaintiff cannot bring an action in state court against an Indian for a reservation-based claim unless the state has accepted Congress's invitation, expressed in Public Law 83–280, 67 Stat. 588 (1953) (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–1326, and 28 U.S.C. § 1360), to accept jurisdiction over most matters occurring on Indian territory within its borders.[1] And "where one is barred from recovery in the state court, he should likewise be barred in the federal court." *Littell*, 344 F.2d at 489 (quoting *Woods v. Interstate Realty Co.*, 337 U.S. 535, 538, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949)). To hold otherwise would run counter to the policy of *Erie Railroad Co.*

*v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ Superior argues that Utah's failure to effectively assume jurisdiction over the reservation should not deprive this court of jurisdiction. The court agrees. Even the Ninth Circuit has rejected the rationale of *Littell* and *Hot Oil* to the extent that those decisions rested on *Erie. Begay v. Kerr-McGee Corp.*, 682 F.2d 1311, 1315–17 (9th Cir.1982). Significantly, however, the Ninth Circuit has never rejected the result in those cases but has reaffirmed that a non-Indian plaintiff is precluded, under 28 U.S.C. § 1332, "from obtaining federal judicial resolution of a dispute which *Williams v. Lee* vests in the tribe's exclusive jurisdiction." *Id.* at 1317; *see also R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 983 (9th Cir.1983) (reaffirming the result in *Littell* and *Hot Oil* ).

■ The court concludes that resolution of this dispute is vested in the Navajo tribe's "exclusive jurisdiction." Although there is no controlling precedent on that issue, Supreme Court decisions of the last twenty-five years or so, beginning with *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), suggest that it is.[2]

*Williams v. Lee* was a suit by a non-Indian plaintiff against an Indian couple to recover for goods sold on the reservation. The Supreme Court held that state courts did not have jurisdiction to hear the case, since exclusive jurisdiction over the matter was vested in the Navajo tribal courts. The Court stated that "to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over

1. Although Utah has accepted such jurisdiction, 1971 Utah Laws 538 (codified at Utah Code Ann. §§ 63–36–9 through –21 (1953) ), its assumption of jurisdiction is expressly conditioned on subsequent tribal consent, Utah Code Ann. § 63–36–10, and to date no Utah tribe has consented to the state's taking jurisdiction. *See* F. Cohen, *Handbook of Federal Indian Law* 363 n. 127.

2. Federal policy toward the Indians, essentially a conquered people, has suffered from a kind of schizophrenia, alternating between periods in which the government has sought to destroy the Indians' separate identity and assimilate them

into mainstream U.S. society and periods in which it has sought to preserve tribes as semiautonomous sovereignties within that society. *See generally* F. Cohen, *supra*, 47–206. One authority calls the period from 1961 to the present one of "self-determination," in which federal policy has been "to promote the practical exercise of inherent sovereign powers possessed by Indian tribes." *Id.* at 180. The prior policy of coercive termination of Indian tribes was officially abandoned in 1958, the year before *Williams v. Lee* was decided.

Reservation affairs and hence would infringe on the rights of the Indians to govern themselves." 358 U.S. at 223, 79 S.Ct. at 272. The Court noted that, implicit in the 1868 treaty with the Navajos, "was the understanding that the internal affairs of the Indians remained *exclusively* within the jurisdiction of whatever tribal government existed." 358 U.S. at 221–22, 79 S.Ct. at 271–72 (emphasis added).

On another occasion the Court recognized that Indian tribes retain "attributes of sovereignty over both their members and their territory." *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975). The Court has also stressed that "Congress' objective of furthering tribal self-government encompasses far more than encouraging tribal management of disputes between members...." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 335, 103 S.Ct. 2378, 2387, 76 L.Ed.2d 611 (1983). The Court has found, for example, that the 1868 Navajo treaty, which reserved certain lands for the exclusive use of the Navajos, "was meant to establish the lands as within the *exclusive* sovereignty of the Navajos under general federal supervision." *McClanahan,* 411 U.S. at 174–75, 93 S.Ct. at 1263–64 (emphasis added). Because of the strong federal interest in encouraging tribal self-government, *see White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980), the Court has "repeatedly" recognized that tribal courts are the "appropriate forums for the *exclusive* adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 65, 98 S.Ct. 1670, 1680, 56 L.Ed.2d 106 (1978) (emphasis added). In short, the Court has "consistently guarded the authority of Indian governments over their reservations." *Williams v. Lee,* 358 U.S. at 223, 79 S.Ct. at 272. As the Court concluded in *Williams,* "If this power is to be taken away from them, it is for Congress to do it." *Id.*

Superior argues that the diversity statute, 28 U.S.C. § 1332, is such an exercise of congressional power and notes that Congress has not expressly withdrawn diversity jurisdiction for claims arising on Indian reservations. The court believes that Superior has reversed the presumptions. The initial inquiry in determining whether this court has jurisdiction based on diversity of citizenship is not whether Congress has limited the application of the diversity statute but whether it intended the statute to reach as far as Superior claims. It is true that, "in the exercise of the powers of self-government, as in all other matters, the Navajo Tribe ... remains subject to ultimate federal control." *United States v. Wheeler,* 435 U.S. 313, 327, 98 S.Ct. 1079, 1088, 55 L.Ed.2d 303 (1978). Congress may limit or even abolish a tribe's sovereignty. "But until Congress acts, the tribes retain their existing sovereign powers," *id.* at 323, 98 S.Ct. at 1086, including the power to adjudicate disputes arising in their territory. Moreover, congressional intent to infringe on tribal sovereignty must be "clear." *See Santa Clara Pueblo v. Martinez,* 436 U.S. at 60, 98 S.Ct. at 1678. The question, then, is whether Congress intended the diversity statute to limit tribal sovereignty by depriving tribes of exclusive jurisdiction over reservation-based disputes. This court concludes that Congress did not.

The diversity statute was first enacted in 1789, Act of Sept. 24, 1789, ch. 20, § 11, 1 Stat. 73, 78–79. It made no mention of Indians, and it is unlikely that Congress had the future status of the Indian tribes in mind when it passed the statute. General statutes should not be construed so as to abrogate rights of tribal self-government absent specific congressional intent to the contrary, *United States v. White,* 508 F.2d 453, 455 (8th Cir.1974), and "available evidence suggests that there was no such intent," F. Cohen, *supra,* at 317. *Accord Littell,* 344 F.2d at 489 (rejecting the argument that 28 U.S.C. § 1332 showed Congress's intent to limit tribal sovereignty). Moreover, Congress has expressly prevented states from assuming jurisdiction over private civil claims that

arise in Indian country and to which Indians are parties unless the Indians in the affected area consent to such an invasion of tribal sovereignty by majority vote at a special election. 25 U.S.C. § 1326. A general statute such as the diversity statute should not be construed so as to get around the policy of tribal self-government expressed in section 1326. *See* F. Cohen, *supra*, at 317 n. 291.

In concluding that this court lacks diversity jurisdiction over a reservation-based tort claim such as Superior's, the court recognizes that other courts have reached contrary conclusions. *See, e.g., Poitra v. Demarrias,* 502 F.2d 23 (8th Cir.1974), *cert. denied,* 421 U.S. 934, 95 S.Ct. 1664, 44 L.Ed.2d 93 (1975); *American Indian Agricultural Credit Consortium, Inc. v. Fredericks,* 551 F.Supp. 1020, 1021 (D.Colo. 1982); *American Indian Nat'l Bank v. Red Owl,* 478 F.Supp. 302 (D.S.D.1979) (following *Poitra* in a case involving a non-Indian plaintiff).

*Poitra* was a wrongful death action between two Indians. The district court dismissed the action for lack of subject matter jurisdiction, citing *Erie* for the proposition that a federal court sitting in diversity could not entertain an action that could not be maintained in state court. Since the state supreme court had closed the doors of state courts to actions such as that in *Poitra,* the district court concluded that it was without jurisdiction to hear the matter. The Eighth Circuit reversed, arguing that state law cannot enlarge or restrict the diversity jurisdiction of federal courts. The court noted that *Erie* was concerned with federal encroachment on state policies and concluded that there was no danger of such encroachment where the federal court was serving as a forum to vindicate a state-created right. The reason the state lacked jurisdiction was because of the special status of Indians under *federal* law, not because of any *state* policy. Moreover, the court found no danger of interference with tribal self-government where one Indian was suing another on a state-created cause of action that did not involve "considerations of policy regarding tribal lands or customs." 502 F.2d at 29. *Accord Ameri-*

*can Indian Agricultural Credit Consortium,* 551 F.Supp. at 1021 ("where an action does not concern a purely internal tribal matter, federal jurisdiction may be consistent with *Williams [v. Lee]*").

The court agrees that *Erie* presents no barrier to its assumption of jurisdiction over the present dispute, since *Erie* is a choice of law doctrine, not a jurisdictional matter, although *Erie* could pose a barrier to the relief sought. *See Begay,* 682 F.2d at 1316–17. However, this court disagrees with the conclusion that a federal court may assume jurisdiction over a private reservation-based claim so long as it does not involve tribal land, a tribal official or tribal policy. Such a position construes "tribal self-government" too narrowly and takes too restricted a view of the rationale of *Williams v. Lee,* which itself found sufficient interference with tribal sovereignty in a purely private action. Although the present dispute involves a tort claim rather than a contract claim and the jurisdiction of the federal courts rather than the jurisdiction of state courts, these differences are legally insignificant. A tribe's interest in self-government is impinged just as much when another court resolves a dispute within the exclusive province of the tribal court whether that other court is a state court or a federal court. *Accord R.J. Williams,* 719 F.2d at 983 ("if a state *or federal* court resolves a dispute which was within the province of the tribal courts ..., that court would impinge upon the tribe's right to adjudicate controversies arising within it") (emphasis added); *Littell,* 344 F.2d at 489 (federal jurisdiction would be "equally disruptive" as state court jurisdiction of the "strong Congressional policy to vest the Navajo Tribal Government with responsibility for their own affairs").

The court recognizes that its conclusion —namely, that it is without jurisdiction to hear reservation-based tort claims such as Superior's—will relegate non-Indian plaintiffs like Superior to what they may perceive as a hostile forum. This court cannot presume, however, that non-Indians will receive less than impartial justice from tribal courts. If it appears that tribal courts are abusing their exclusive jurisdiction in these

matters, the remedy is with Congress, which has already taken steps to ensure that tribal courts comport with accepted notions of due process and equal protection by enacting the Indian Civil Rights Act, § 202(8), 25 U.S.C. § 1302(8) (1982). *See also Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926, 933 (10th Cir.1975) (the guarantees of 25 U.S.C. § 1302 are available to non-Indians as well as Indians). A contrary decision (namely, that this court has concurrent jurisdiction over this matter with the tribal court) would mean that non-Indian plaintiffs would almost always sue in federal court, while Indian plaintiffs would almost always sue in tribal court over similar reservation-based disputes, leading to inconsistent results depending on the forum selected since each forum would apply its own procedural rules and, at times, different substantive rules. It was just such inconsistency that the Supreme Court eschewed in *Erie*.

The court acknowledges that Indian tribes do not enjoy unlimited sovereignty. Congress could choose to give federal district courts concurrent jurisdiction with tribal courts over all reservation-based disputes or over all such disputes where the parties are of diverse citizenship. But until Congress *clearly* acts to limit that sovereignty, it is threatened just as much by a federal court's assumption of jurisdiction as by a state court's. The diversity statute, 28 U.S.C. § 1332, is simply not such a clear expression of a congressional intent to limit tribal sovereignty. *Cf.* 28 U.S.C. § 1362 (clearly conferring jurisdiction on district courts to hear civil actions brought by an Indian tribe and involving a federal question).

**3.** The conclusion that this court lacks jurisdiction might be different if Superior had asserted that the tribal court lacked jurisdiction over the matter, *see National Farmers Union Ins. Co. v. Crow Tribe of Indians*, —— U.S. ——, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), or, perhaps, that it had been refused access to tribal courts, *see R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979 (9th Cir.1983) (plaintiff's claim of diversity jurisdiction would have to await the tribal court's decision as to whether or not it had jurisdiction of the matter). Superior has not questioned the jurisdiction of the tribal court over this matter. Rather, it merely asserts that

Because this court lacks subject matter jurisdiction in this matter, Superior's complaint must be dismissed.[3]

this court has concurrent jurisdiction. The jurisdiction of the tribal court seems clear. *See* Navajo Tribal Code, title 7, § 253(2) ("The Trial Court of the Navajo Tribe shall have original jurisdiction over ... [a]ll civil actions in which the defendant is a resident of Navajo Indian country, or has caused an action to occur in Navajo Indian country"), *quoted in* defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss at 12 n. 1. In any event, the question of the tribal court's jurisdiction is properly left to that court in the first instance. *See National Farmers*, —— U.S. ——, 105 S.Ct. at 2454.