COUNTY OF LEWIS;  Don Fortney;
Thomas F. Myers, Plaintiffs–
Appellees,

v.

John D. ALLEN, Defendant,

and

Nez Perce Tribe;  Nez Perce Tribal Court;
Judges of the Nez Perce Tribal Court,
Defendants–Appellants.

No. 94–35979.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 16, 1995.

Withdrawn From Submission
March 20, 1997.

Resubmitted July 1, 1997.*

Decided April 23, 1998.

Amended May 5, 1998.

Second Amendment July 24, 1998.

* After this case was submitted, the Supreme Court granted certiorari in *A–1 Contractors v. Strate,* 76 F.3d 930 (8th Cir.1996) (en banc).  *See Strate v. A–1 Contractors,* — U.S. —, 117 S.Ct. 37, 135 L.Ed.2d 1128 (1996).  We awaited that decision and obtained supplemental briefing on its effect, because it was likely to affect the disposition of the case at bar.

Douglas Roger Nash, Office of Legal Counsel, Nez Perce Tribal Executive Committee, Lapwai, ID, for Defendants–Appellants.

Marc A. Lyons, Ramsden & Lyons, Coeur d'Alene, ID, for Plaintiffs–Appellees.

Before: BOOCHEVER, FERNANDEZ, and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This case deals with a tribal court's jurisdiction over a nonmember in a tort action.

### FACTS

Lewis County is a subdivision of the State of Idaho. Much of its territory is within the Nez Perce Indian Reservation. The Nez Perce Tribe, by formal resolution, consented to Idaho's assumption of concurrent criminal jurisdiction within the reservation over a number of minor offenses, including disturbing the peace.

According to a stipulation of facts filed by John D. Allen and the State of Idaho in Allen's criminal appeal, a woman (not a party to that case or this one) called the County Sheriff's Office, and complained of being battered by a bartender. Deputy Sheriff Tom Myers, one of the appellees, went to the Allen house to interview her. Mr. and Mrs. Allen and the woman who called had all been drinking together at the bar. All three were intoxicated, and kept interrupting Deputy Myers as he tried to interview the woman. Eventually Deputy Myers gave up. As he left, the Allens yelled obscenities at him and Mr. Allen shook his fist at him. Deputy Myers told them to quiet down or they would be arrested. Mr. Allen continued to yell at him, so Deputy Myers arrested him for disturbing the peace.

A state magistrate dismissed the disturbing the peace charge, after a jury trial. He ruled that "the only peace disturbed was that of Officer Myers," and "it is stare decisis that

a police officer is not a 'person' under the disturbing the peace statute, Idaho Code § 18–6409."

When the state misdemeanor case against Mr. Allen ended, Mr. and Mrs. Allen sued Deputy Sheriff Myers, Sheriff Fortney, and Lewis County. They filed the suit in Nez Perce Tribal Court, not an Idaho state court or federal court. The Allens sued for false arrest, assault and battery, false imprisonment, and malicious prosecution, and stated a federal constitutional civil rights claim under 42 U.S.C. § 1983.

The tribal court case went to trial. The jury found that although Deputy Sheriff Myers had intentionally or wantonly violated Mr. Allen's liberty interests, he acted in good faith. The jury decided that the damages were attributable 10% each to Mr. and Mrs. Allen, 45% to Deputy Sheriff Myers, 25% to Sheriff Fortney, and 10% to Lewis County. Despite finding that Deputy Sheriff Myers acted in good faith, the jury awarded punitive as well as compensatory damages.

The defendants objected to the tribal court's jurisdiction from the beginning, and exhausted their remedies within the tribal court system on their jurisdictional objection. The Tribal Court of Appeals affirmed the judgment against the defendants. It said that "protecting community residents, Indian or non-Indian, from the wrongful conduct of law enforcement officers who operate within the exterior boundaries of the Nez Perce Reservation is a legitimate safety concern." The Allens' house was on fee land, not trust land, but the record does not indicate who owned it. Mr. Allen was a member of the tribe, his wife was not, and the Sheriff and Deputy Sheriff were not.

Having exhausted their remedies in tribal court, Deputy Sheriff Myers, Sheriff Fortney and Lewis County sued in the United States District Court for a declaratory judgment that the tribal court judgment was void for lack of jurisdiction, and an injunction against enforcement of the judgment. The district court granted summary judgment in favor of the County, Sheriff and Deputy Sheriff and issued the declaratory judgment and injunction sought. The appellants are the Nez Perce Tribe, Nez Perce Tribal Court, and judges of the Nez Perce Tribal Court. Appellees are the County of Lewis and its sheriff and deputy sheriff.

## ANALYSIS

### I. Federal question jurisdiction.

■ The tribe argues that the federal district court lacked federal question jurisdiction, because the county and its officers could not point to a federal statute or constitutional provision that the tribal court violated. The argument is based on the statement in *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 18, 107 S.Ct. 971, 977–78, 94 L.Ed.2d 10 (1986), that civil jurisdiction over non-Indians on reservation lands "presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute."

The argument is based entirely on a quotation out of context. *Iowa Mutual* deals with exhaustion, not the extent of federal question jurisdiction in federal court. *Iowa Mutual* and *National Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), "describe an exhaustion rule allowing tribal courts initially to respond to an invocation of their jurisdiction." *Strate v. A–1 Contractors*, — U.S. ——, ——, 117 S.Ct. 1404, 1410, 137 L.Ed.2d 661 (1997).

■ That the tribe's argument is wrong is settled decisively by *National Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). There were two issues in that case, federal question jurisdiction in district court and exhaustion in tribal court. A school district sought a federal declaratory judgment and injunction against enforcement of a tribal court judgment, as in the case at bar, but had not yet exhausted its tribal court remedies. The Court held that a challenge to tribal court jurisdiction over non-Indians is a matter of federal common law. Because federal common law controls, the question of tribal court jurisdiction is a federal question under 28 U.S.C. § 1331. *Id.* at 850–53, 105 S.Ct. at 2450–52. "[A] federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its

jurisdiction." *Id.* at 853, 105 S.Ct. at 2452. "The Supreme Court has squarely held that such an issue raises a question of federal common law." *Arizona Public Service Co. v. Aspaas,* 77 F.3d 1128, 1132 (9th Cir.1995).

## II. Tribal court jurisdiction.

The declaratory judgment issued by the district court holds that the tribal court had no jurisdiction over the Allens' lawsuit against the sheriff, deputy sheriff, and county, and enjoined enforcement of the tribal court judgment. The tribe argues that this ruling was incorrect. It is undisputed that (1) the sheriff, deputy sheriff, and of course the county are not tribal members; (2) the arrest giving rise to the Allens' lawsuit occurred within the reservation.

### A. Adjudicatory authority.

■ The tribe argues, in substance, that a tribal court is presumed to have jurisdiction over activities on reservation territory, regardless of whether the defendants are tribal members. They base this largely on *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). But they misread that case. *Williams* was a collection case in state court by a non-tribal member for goods sold to a tribal member on the reservation. The Supreme Court held that the state court lacked jurisdiction, because the state had not assumed it, and no federal act gave the state court jurisdiction over such claims.

The Supreme Court has recently explained that *Williams* is among those cases "fitting within the first exception" in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), for nonmembers who enter into consensual commercial relationships with tribal members. *Strate v. A–1 Contractors,* — U.S. —, —, 117 S.Ct. 1404, 1415, 137 L.Ed.2d 661 (1997). Those cases, in which tribal courts do have jurisdiction over nonmembers, fall within an exception to the general rule that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258. The reason for the rule is that tribal power, except when Congress expands it by express delegation, is limited to what is

necessary to protect tribal self-government and control internal relations:

Thus, in addition to the power to punish tribal offenders, Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.

*Id.* at 564, 101 S.Ct. at 1257–58 (citation omitted).

Application of the *Montana* rule was thrown into question by our decision in *Hinshaw v. Mahler,* 42 F.3d 1178 (9th Cir.1994). In that case, we appeared to hold that a tribe generally has jurisdiction over nonmember defendants for torts on its reservation, where the tribe's jurisdiction has not been limited by statute or treaty. A car-motorcycle accident on a federal highway between nonmembers of the tribe killed the motorcycle driver. His mother, a tribal member, sued the automobile driver in tribal court for wrongful death, and we upheld the tribal court's assertion of jurisdiction.

The Eighth Circuit expressly disagreed with *Hinshaw,* in *A–1 Contractors v. Strate,* 76 F.3d 930, 937–39 (8th Cir.1996) (en banc). That case involved a car accident on a state highway on a reservation. The driver, a nonmember of the tribe, and her children, who were tribal members, sued the other driver in tribal court. The Eighth Circuit held that the tribal court lacked jurisdiction, and said of our decision in *Hinshaw,* that "such a broad interpretation of civil tribal jurisdiction is, we believe, inconsistent with *Montana.*" *Id.* at 939. We distinguished *Hinshaw* in *Yellowstone County v. Pease,* 96 F.3d 1169, 1176 (9th Cir.1996), but *Hinshaw* remained law of the circuit.

Subsequent to *Hinshaw* and *Yellowstone,* the Supreme Court decided that the Eighth Circuit's view was correct. *Strate v. A–1 Contractors,* — U.S. —, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), affirms the Eighth

Circuit's en banc decision, and implicitly overrules *Hinshaw. See Wilson v. Marchington,* 127 F.3d 805 (9th Cir.1997). *Strate* reminds us that "tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances," and *Montana* is "the path-marking case concerning tribal civil authority over nonmembers." *Strate,* 520 U.S. at ——, 117 S.Ct. at 1409.

The issue in *Montana* was the tribe's authority to regulate hunting within the borders of the reservation by nonmembers on their own land owned in fee simple. *Montana* held that the tribe lacked jurisdiction. In *Strate,* the tribes argued that *Montana* applied only to regulatory, not to adjudicatory, authority, but *Strate* rejects that distinction; the rule against jurisdiction over nonmembers applies to both. *Strate,* 520 U.S. at ——, ——, 117 S.Ct. at 1410, 1413. *National Farmers Union Insurance Companies v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and *Iowa Mutual Insurance Company v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), merely "describe an exhaustion rule ... neither establishes tribal court adjudicatory authority." *Strate,* 520 U.S. at ——, 117 S.Ct. at 1410. *Strate* notes that the statement in *Iowa Mutual* that civil jurisdiction "presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute" had been read out of context as though it changed the *Montana* presumption; the statement "was made in refutation of the argument that 'Congress intended the diversity statute to limit the jurisdiction of the tribal courts.'" *Strate,* 520 U.S. at ——, 117 S.Ct. at 1412.

◼ The amicus curiae brief argues that the status of the land determines whether the tribal court has jurisdiction. The amicus argues that the tribal court has jurisdiction over nonmembers for torts on tribal and trust lands, though not on land held in fee simple by non-Indians. Because the record does not establish whether the fee land the Allen residence was on was Indian-owned or non-Indian-owned, the amicus urges a remand to develop the record on this point. We reject this argument.

There are circumstances where the state of the title to land affects whether it is "Indian country." For example, Indian country includes "rights-of-way" in 18 U.S.C. § 1151, the general criminal provision, but excludes "fee-patented lands" and "rights-of-way" in the intoxicating liquors provision, 18 U.S.C. §§ 1154(c) and 1156. But these distinctions are immaterial to the case at bar. It has been assumed throughout the case that the Allen residence was in Indian country, and we proceed on that assumption. We therefore proceed to the question whether the tribe has adjudicative jurisdiction within Indian country over the activities of nonmembers without regard to whether the land on which the alleged torts took place might have been owned in fee by tribal members.

As noted above, the question in *Montana* was whether the tribe could regulate hunting and fishing by nonmembers on lands owned in fee simple by non-Indians within the reservation. The answer was no. The tribe could prohibit nonmembers from hunting and fishing on lands belonging to the tribe or held by the United States in trust for the tribe, but its inherent sovereignty was not so broad as to support regulatory authority over non-Indian fee lands. The reason was the "implicit divestiture of sovereignty ... involving the relations between an Indian tribe and nonmembers of the tribe." *Montana,* 450 U.S. at 564, 101 S.Ct. at 1257, quoting *United States v. Wheeler,* 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978). The general rule is that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258.

Because *Montana* involved land held in fee by non-Indians, the tribes argued in *Strate* for a distinction because the land in *Strate* was held by the United States in trust for the tribes, not in fee simple by non-Indians as in *Montana.* The Court rejected the distinction, in the context of sovereign authority to adjudicate tort cases involving nonmembers. *Strate* distinguished between "a landowner's right to occupy and exclude," *Strate,* 520 U.S. at ——, 117 S.Ct. at 1414, and "control over nonmember conduct ... for nonmember governance purposes." *Id.* at

——, 117 S.Ct. at 1413. Because the highway over Indian trust land was open to the public, "the Tribes cannot assert a landowner's right to occupy and exclude." *Id.* at ——, 117 S.Ct. at 1414. For that reason, even though the accident occurred on trust land, the Court decided to "align the right-of-way, for the purpose at hand, with land alienated to non-Indians." *Id.* The "purpose at hand" in *Strate,* as in the case at bar, was determining the scope of tribal governmental authority to adjudicate tort actions involving nonmembers.

In the case at bar, because the Nez Perce Tribe had obtained law enforcement services from Lewis County by formally consenting to concurrent criminal jurisdiction within the reservation, it had, like the tribes in *Strate,* given up whatever "landowner's right to occupy and exclude," *id.* at ——, 117 S.Ct. at 1414, it might otherwise have had with respect to Lewis County law enforcement personnel.[1] For that reason, regardless of who owned the fee for the land where the Allen house was, we, like the Court in *Strate,* align the land for purposes of determining the scope of the tribe's adjudicatory authority over nonmembers with land owned by nonmembers in fee. *Cf. Strate,* 520 U.S. at ——, 117 S.Ct. at 1414. From the point of view of the exercise of adjudicative authority over nonmember county law enforcement officers, it does not matter how the land was owned, because the tribe had given up its right to exclude them. That is the significance of *Strate*'s decision to "align the right-of-way, for the purpose at hand, with land alienated to non-Indians."

We do not intimate that, had the tribe not consented to entry by Lewis County law enforcement officials, then it could have adjudicated their tort cases in tribal court. Indeed, the implication of *Montana* is that with respect to adjudication, "the inherent sover-

eign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258, unless one of the two *Montana* exceptions applies. *Montana* reminded us that the law long has been that tribes lack the "right of governing every person within their limits except themselves." *Id.,* citing *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 209, 98 S.Ct. 1011, 1021, 55 L.Ed.2d 209 (1978), quoting *Fletcher v. Peck,* 6 Cranch 87, 147, 10 U.S. 87, 3 L.Ed. 162 (1810). *Montana* explained that due to their "dependent status," Indian tribes have lost many attributes of sovereignty, and the main areas "in which such implicit divestiture of sovereignty has been held to have occurred are those involving *the relations between an Indian tribe and nonmembers of the tribe.* . . ." *Montana,* 450 U.S. at 563–64, 101 S.Ct. at 1257 (emphasis in the original) (citation omitted). *Montana* held that "[t]hough *Oliphant* only determined inherent tribal authority in criminal matters, the principles upon which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565, 101 S.Ct. at 1258. However, because the holding of *Strate* applies to this case, we need not consider any further effects of *Montana* upon tribal authority to adjudicate tort claims.

**B. Exhaustion.**

■ The amicus also argues that we should remand to the district court with instructions to abstain while the tribal court reconsiders its own jurisdiction in light of *Strate.* *Strate* rejects the argument that exhaustion of jurisdictional issues in tribal court is a precondition to jurisdiction in federal district courts. The exhaustion rule is "'prudential,' not jurisdictional." *Strate,* 520 U.S. at ——, 117 S.Ct. at 1412. *Strate* holds that when "it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by *Montana*'s main rule, . . . the otherwise applicable ex-

---

1. In *El Paso Natural Gas Co. v. Neztsosie,* 136 F.3d 610 (9th Cir.1998), we held that *Strate* was "inapposite to the facts of this case," because the land at issue was open to the public and publicly maintained in *Strate* but not in *El Paso,* the tribe

"retained tribal sovereignty over the land" in *El Paso,* and "uranium contamination poses a danger to the 'health or welfare of the tribe.'" *Id.* at n. 5. These distinctions do not apply between *Strate* and the case at bar.

haustion requirement must give way, for it would serve no purpose other than delay." *Strate*, 520 U.S. at ——, n. 14, 117 S.Ct. at 1416, n. 14. This is such a situation, so remand, abstention, and a second consideration of jurisdiction in tribal court is unnecessary.

## C. The *Montana* exceptions.

■ The tribe argues that both *Montana* exceptions apply, consensual relations and effect on tribal self-government. *Strate* expressly rejects the broad reading of those exceptions that this argument requires. It is a mistake to ignore the general rule, that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258, while taking the exceptions to the limits that their words, were they not limited by the general rule, might imply.

■ Here is the language in *Montana* of the first exception to the general rule of no tribal jurisdiction over nonmembers:

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.

*Montana*, 450 U.S. at 565, 101 S.Ct. at 1258. The County, though not the sheriff and deputy sheriff, did enter into a "consensual relationship[ ] with the tribe." In *Strate*, the Court held that an analogous consensual relationship did not fall within the exception:

> Although A–1 was engaged in subcontract work on the Fort Berthold Reservation, and therefore had a "consensual relationship" with the Tribes, "Gisella Fredericks was not a party to the subcontract, and the [T]ribes were strangers to the accident."

*Strate*, 520 U.S. at ——, 117 S.Ct. at 1415 (citations omitted). The consensual relationship exception likewise does not apply to the case at bar.

■ The agreement between the tribe and the County concerned concurrent criminal jurisdiction. It did not expressly or by implication give rise to adjudicative authority over private tort actions brought by third parties,

nor is it clear that it could. Also, the "consensual relationships with the tribe or its members" addressed by this exception— "commercial dealing, contracts, leases, or other arrangements," *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258—are generally commercial relationships entered into by the nonmember in order to obtain some benefit from the tribe or tribal member. *Strate* explains that "*Montana*'s list of cases fitting within the first exception ... indicates the type of activities the Court had in mind: ... on-reservation sales transaction ... tribal permit tax on nonmember-owned livestock ... permit tax on nonmembers for the privilege of conducting a business ... terms upon which noncitizens may transact business ... tax on-reservation cigarette sales." *Strate*, 520 U.S. at ——, 117 S.Ct. at 1415. *See, e.g., FMC v. Shoshone–Bannock Tribes*, 905 F.2d 1311 (9th Cir.1990); *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587 (9th Cir. 1983); *Cardin v. De La Cruz*, 671 F.2d 363 (9th Cir.1982). The exception expressly limits the term "consensual relationships" by the phrase, "through commercial dealing, contracts, leases, or other arrangements." Upon the principle of ejusdem generis, we believe that the term "or other arrangements" is to be construed as limited to types of arrangements similar to commercial dealing, contracts, and leases. The County's entry into a consensual relationship with the tribe was not a commercial relationship entered into for mutual benefit. The tribal executive committee resolution says "the Indians residing on the Nez Perce Indian Reservation ... are desirous at this time of having the State of Idaho assume and exercise criminal jurisdiction over offenses other than those commonly known as the major crimes, committed by Indians residing on the reservation." This is a noncommercial provision of a service to the tribe, not an exchange of commercial benefits.

■ The second *Montana* exception to the rule of no jurisdiction over nonmembers applies to conduct that threatens or directly affects tribal political integrity, economic security, or health and welfare:

> A tribe may also retain inherent power to exercise civil authority over the conduct of

non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

The words of this second exception, taken in isolation from the general rule they qualify, could be read broadly or narrowly. In *Montana*, the Court held that the tribe lacked regulatory authority over nonmembers' hunting on fee lands within the reservation, despite the effect hunting might have on the political authority of the tribe within reservation borders, and the importance of game to the welfare of tribal members who used hunting to put meat on the table. The facts of *Montana* thus imply a narrow interpretation for the second exception.

Strate confirms that the second *Montana* exception must be narrowly construed. Though recognizing that careless driving on the highway through the reservation would "surely jeopardize the safety of tribal members," *Strate* holds that "if *Montana*'s second exception requires no more, the exception would severely shrink the rule." *Strate* 520 U.S. at ——, 117 S.Ct. at 1416. The Court recognized that "[r]ead in isolation, the *Montana* rule's second exception can be misperceived." *Strate* holds that the second exception must be understood as an elaboration of the limitation of a tribe's power to tribal self-government and internal relations:

> Key to its proper application, however, is the Court's preface: "Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.... But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations."

*Strate*, 520 U.S. at ——, 117 S.Ct. at 1416 (brackets and bracketed language in original). In *Strate*, the Court held that regulation of the highway passing through the reservation, on trust land subject to a right-of-

way, was not necessary to preserve tribal self-government and protect tribal welfare. Likewise, once the tribe had decided to arrange for the County to provide law enforcement services, a decision not at issue here, Deputy Myers' arrest of Mr. Allen did not bear on tribal self-government.

*Strate* clears up what was previously "a subject of much debate but few decisions," William C. Canby, Jr., *American Indian Law* 143 (1981): the extent of tribal adjudicatory authority over non-Indian defendants. It is now established for purposes of civil adjudicatory authority that the general rule is as announced in *Montana*: "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258. *Montana* is broadly construed, and the two exceptions are read narrowly in the context *Montana* sets them in. The magistrate judge and district judge correctly understood *Montana*, and our interpretation in *Hinshaw* was mistaken.

## CONCLUSION

The tribal court lacked jurisdiction to adjudicate the claims against defendants, because the defendants were nonmembers, and the claims neither arose out of a consensual commercial relationship between the plaintiffs and defendants nor threatened or directly affected the political integrity, economic security, or health or welfare of the tribe.[2]

AFFIRMED.

BOOCHEVER, Circuit Judge, concurring:

This case involves an agreement between two governmental entities, the tribe and the county. I concur in the opinion's holding that the agreement does not confer tribal court jurisdiction over county personnel present on tribal lands pursuant to that agreement.

The Supreme Court has held that tribal *criminal* jurisdiction is limited to tribal

---

**2.** We need not reach the questions raised by (1) the County's motion to remand for a determination of whether the Nez Perce reservation has been disestablished; (2) the Tribe's motion for sanctions against the County for making that

motion; (3) the defendants' argument that subjecting them to jurisdiction in a tribunal in which nonmembers of the tribe such as themselves would be excluded from the jury violates the Equal Protection Clause.

members. *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). In defining the scope of tribal civil jurisdiction, however, the Supreme Court has applied both geographic and membership limitations. *Strate v. A–1 Contractors,* — U.S. ——, ——, 117 S.Ct. 1404, 1414, 137 L.Ed.2d 661 (1997); *Montana v. United States,* 450 U.S. 544, 565–66, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981).

I agree that *Strate* and *Montana* apply in this case, but I do not believe the question whether tribal civil jurisdiction extends to nonmembers turns simply upon whether "the nonmember of the tribe has a right to be where he is." *Ante,* at 4358. That seems at odds with the Supreme Court's statement of the general rule "that tribes retain considerable control over nonmember conduct on tribal land." *Strate,* 520 U.S. at ——, 117 S.Ct. at 1413.

In *Montana,* the Supreme Court held that the tribe lacked jurisdiction "to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe," *Montana,* 450 U.S. at 557, 101 S.Ct. at 1254, unless either of two exceptions was satisfied. *Id.* at 565–566, 101 S.Ct. at 1258–59. However, finding the ownership of the land to be determinative, the Court distinguished reservation land alienated to non-Indians from other reservation land: "the Tribe may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe." *Id.* at 557, 101 S.Ct. at 1254.

The Supreme Court continued and clarified *Montana*'s land ownership-based view of jurisdiction in *Strate.* In *Strate,* the Supreme Court aligned a right-of-way, ceded to North Dakota for the limited purpose of a state highway, with the land owned in fee by nonmembers discussed in *Montana.* At the same time, the Court expressed "no view on the governing law or proper forum when an accident occurs on a tribal road within a reservation." *Strate,* 520 U.S. at ——, 117 S.Ct. at 1408. In deciding to align the right-of-way with land owned in fee by nonmembers, the Supreme Court reviewed the rights and incidents of ownership and control which the tribe had ceded to the state:

> Apart from [the right to construct and maintain highway crossings], the Three Affiliated Tribes expressly reserved no right to exercise dominion or control over the right-of-way.
>
> Forming part of the State's highway, the right-of-way is open to the public, and traffic on it is subject to the State's control. The Tribes have consented to, and received payment for, the State's use of the 6.59–mile stretch for a public highway. They have retained no gatekeeping right. So long as the stretch is maintained as part of the State's highway, the Tribes cannot assert a landowner's right to occupy and exclude. *Cf. Bourland,* 508 U.S. at 687–91, 113 S.Ct. at 2316–17 (regarding reservation land acquired by the United States for operation of a dam and a reservoir, Tribe's loss of "right of absolute and exclusive use and occupation ... implies the loss of regulatory jurisdiction over the use of the land by others"). We therefore align the right-of-way, for the purpose at hand, with land alienated to non-Indians. Our decision in *Montana,* accordingly, governs this case.

*Id.* at ——, 117 S.Ct. at 1414. In *Strate,* the Court evaluated the status of the land where the accident occurred to determine which among the bundle of rights associated with land ownership and sovereignty the tribe had alienated to the state. The Court employed a totality of the circumstances test, rather than finding one single right or incident of ownership to be dispositive.

In this case, the agreement between the tribe and the county granted law enforcement officers authority to patrol the reservation, to investigate misdemeanor crimes, and to make arrests. Similar to the tribe's failure to expressly reserve a right to exercise dominion or control over the right-of-way in *Strate,* here the tribe did not reserve the right to exercise dominion or control over the law enforcement officers. With respect to those law enforcement activities, the tribe ceded to the county some of its inherent sovereign powers, and voluntarily gave up some measure of its right to exercise dominion and control over the reservation. The county officer, acting in good faith according

to the tribal court, was engaged in such activity. It was primarily for the tribe's benefit that the county assumed the responsibility and necessary expenses of such law enforcement, so that it is reasonable to infer that the tribe impliedly waived jurisdiction, as it might over a right-of-way ceded for a limited purpose, i.e., a highway (*see Strate*), or a railway (*see Burlington Northern Railroad Co. v. Red Wolf,* 106 F.3d 868 (9th Cir.), vacated, —— U.S. ——, 118 S.Ct. 37, 139 L.Ed.2d 5 (1997) (vacated and remanded "for further consideration in light of *Strate*")). Under these circumstances the waiver of jurisdiction over this narrow field of activity, involving the area of the entire reservation rather than a mere right-of-way, results from the tribe's voluntary action.

I agree that *Montana*'s contractual exception to a lack of tribal jurisdiction does not apply to the type of agreement between governmental entities presented in this case. I do not believe, however, that this is an appropriate case in which to attempt a broad expansion of *Strate*'s holding, for we need not decide whether, "[i]f the nonmember of the tribe has a right to be where he is," the tribe is stripped of all civil jurisdiction. *Ante,* at 4358.